It is stated in said petition that on April 4, 1904, the defendants as such commissioners sold bonds of this county in the sum of $9,500, and propose to issue additional bonds in the sum of $35,000; that the June collection of taxes will be $7,000 more, making a total of $51,500, not including premium on the bonds to be sold May 25, 1904; that said commissioners propose to expend the above sum of money this summer in repairing and building new bridges; and that some thirty new bridges will *262 be required, and also iron pipe for culverts; that some of these bridges will cost more than $1,000, and others less, but plaintiff is without information, as no plans and specifications, or estimates of the cost have been made. That defendants are not filling estimates as to the probable cost of said bridges and culverts; that they have not called upon the county surveyor or any other competent engineer to make an estimate of the probable cost of said bridges and culverts, together with the plans and specifications therefor; that defendants are proceeding to contract, and are now making contracts for said bridges and culverts, without any estimate of cost of the same, and making contracts for bridges and iron pipe for culverts which will exceed $1,000 without advertising for bids, as required by law; making separate and single contracts for each and every bridge and for iron pipe for culverts, in order to keep from advertising for bids and to avoid a free and open letting of contracts.
The foregoing are the material allegations of plaintiff’s petition, necessary to be considered in determining whether an injunction should be granted or not.
The defendants answering, say that the recent flood rendered useless and impassable many bridges in this county, and that the demand upon them to make repairs and construct new bridges was such, that after a careful examination of the roads by personal inspection, they took the proper legal steps for the issue and sale of bonds, and thus provide a fund to make the highways passable and safe for public travel.
They deny that they have made any contracts for bridges that exceed $1,000 in cost, and in all instances the cost of bridges is less than $1,000; that specifications in detail have been in all cases previously submitted, and when contracts were awarded, the specifications became a part of the contract, and a matter of record in the auditor’s office. They deny that they are proceeding to contract for bridges anddron pipe, without any estimate of the probable cost of the same being made; that they gave all competitors and bridge builders equal opportunity from actual view of the premises and surrounding conditions, and their specification to determine the price of each and every bridge, etc., and they believe that by the contracts already entered into there has been large saving of money to Ashland county.
*263 They admit entering into contract, after the fullest investigation for twenty-sis bridges; that these contracts have not be.en filed, for the reason that the .sale of bonds was postponed on account of defect in advertising.
Upon the issues as thus outlined, the case has been submitted, the testimony of the defendants themselves, as to their doings in the matters complained of, only being offered.
From the testimony of Commissioner T. W. Hunter it appears that these contracts were made with the King Bridge Co., of Cleveland, the Canton Bridge Co., of Canton, and the Mt. Yernon Bridge Co., of Mt. Yernon; that some of these contracts were made at their office and some at the hotel, after they went in company of an agent to see what was needed. None of these contracts were filed in the auditor’s office.
The commissioners never made or filed bills of material or estimates of cost at the auditor’s office of any of these bridges before these contracts were signed up. The contracts signed were printed forms furnished by the bridge companies. The bridge companies furnished some kind of a blue print or drawing of these bridges and these drawings were attached to the contracts. The commissioners and an agent of the bridge company would go to the bridge and look it over. No surveyor was taken. The agent would take notes of the length and size of the bridge; the cost of the bridge was not figured. They never submitted, as commissioners, any plans or specifications, bills of material or estimates, to the auditor or surveyor with the three commissioners for approval. These contracts were made with the three companies mentioned, each having a certain number, and the agent of but one company was taken with the commissioners at the same time; and these three companies never bid together at one bridge. During his term of office, in no case have specifications and plans been filed in the auditor’s office, in the first instance, and they have never offered competition on any particular bridge.
The testimony of Mr. Snyder and Mr. Walters does not differ ■ from the foregoing and I simply refer to enough to render intelligible what is to follow. Paper writings purporting to be contracts between these three bridge companies and the county *264 commissioners are before me as exhibits of the doings of these parties, those of the Canton Bridge Co. appearing as duplicates. The originals are probably in possession of the company. None of these contracts were made by the commissioners in their office' by their official action and entered upon their journal of proceedings. Indeed, it seems that these bridge companies have constituted themselves the arbiters of the bridge building in this county if we are to judge from what has been shown before me.
By invitation of the commissioners or otherwise, they visit separately the location where the bridge is needed, prepare their own plans and specifications, fill up a blank contract of their own preparation, fix their price, the agent signs on the part of of his company, and the commissioners, in their official capacity, do likewise for the county. In this manner paper contracts have been signed for twenty-six bridges, costing in the aggregate, $14,195, distributed as follows: Thirteen bridges, Mt. Vernon Bridge Co., $6,084.64; five bridges, King Bridge Co., $3,762; eight bridges, Canton Bridge Co., $4,349. During the coming year it is proposed to expend nearly $40,000 more.in the erection and repair of bridges in this county. Tax-payers have a right to know that this money is expended in conformity with the laws of the state and not in any other way. -County commissioners are creatures of law, and can do no act in their official capacity without the pale of the law. that will bind the county. The duty of commissioners is outlined by statute as follows, as to the erection of bridges:
Section 795, Revised Statutes, provides that the commissioners “shall make, or may procure some competent architect or civil engineer to make full, complete and accurate plans therefor, showing all the necesary details of the work and materials that will be required for the same, * * * and also accurate bills, showing the exact amount of all the different kinds of materials to be used in the erection thereof, addition thereto, or in the alteraton of the same, and they shall accompany the plan or plans. ’ ’
He, the architect or civil engineer, shall also make a full, ae-? curate and complete estimate of each item of expense, and the *265 entire aggregate of cost of the building or bridge substructure as the ease may be; but the commissioners may receive from bidders on iron substructures for bridges the necessary plans and specifications therefor.
Section 796, Revised Statutes, provides:
“When it becomes necessary to erect a bridge, the commissioners shall determine the length and width of the superstructure * * * and shall advertise for proposals for performing the labor and furnishing the material necessary to the erection thereof, * * * and invite bids or proposals in accordance with the same; but they shall also invite, receive and consider proposals on any other plan at the option of bidders and shall require that all proposals on such other plan shall be accompanied with plans and specifications showing and setting forth the number of spans, the length of each, the nature, quality and size of material to be used in the erection of such bridge, the strength of the structure when completed, * * * . and the plan or plans and specification or specifications upon and according to which such contracts are awarded, shall be kept on file in the office of the auditor and made a part of the contract.”
The commissioners shall in their advertisement for proposals, invite bidders to make the same for furnishing all the material and performing .all the work or for such part as bidders see proper, and shall state the time and place where bids will be opened and the contract or contracts awarded.
Section 797, Revised Statutes, provides that the plans and specifications and estimates required by Sections 795 and 796, if they relate to a bridge, “shall be submitted to said commissioners, county auditor and county surveyor, and if approved by a majority of them, a copy thereof shall in like manner be deposited with the county auditor” for the inspection of all parties interested.
Section 798, Revised Statutes, provides that “when the estimated cost of any public building or a bridge, and the substructure thereto * * * does not exceed $1,000, the same may be let at private contract without publication.
This section also provides that after plans, descriptions, bills of material, specifications and estimates are made and approved as in the foregoing sections, the county auditor shall give pub- *266 lie notice in two of the principal papers, having the largest circulation in the county, when and where sealed proposals will be received for performing the labor and furnishing the material' necessary to the erection of such bridge, and that notice must be published for four consecutive weeks next preceding the day named for making such contract and shall state when and where such plans, descriptions and specifications can be seen, and which shall be open to public inspection at all reasonable hours, between the dates of such notice and the making of the contracts..
It is claimed by plaintiff that these sections have not been complied with by the commissioners in their attempt to let these contracts, and unless they are simply directory, and may be observed or not, at the pleasure of the commissioners, everything done by these offeials, as shown by the evidence, is absolutely void.
The board of county commissioners can exercise no powers not expressly given by statute, and when the law directs what shall' be done preliminary to the expenditure of the public money, courts will not hesitate to call a halt in cases where these officials have not fully complied with the requirements of the statute.
If the provision of the statute to which I have called attention are mandatory, commanding the things therein contained, there has not been a single step taken by the commissioners authorizing them to enter into any one of the twenty-six contracts in question. The law, in explicit terms, prescribes what the commissioners shall do before entering into any contract such as contemplated here. They shall make or procure some competent architect or civil engineer to make full and complete and accurate plans showing all the necessary details of the work and materials, and accurate bills of the exact amount of the different kinds of material, an accurate and compete estimate of each item of expense, and the aggregate cost of each bridge.
In all of these sections the word “shall” is used, wherein the commissioners are required to do certain things. They “shall” determine the length and width of the bridge, and ■“shall” advertise for proposals for performing the labor and *267 furnishing the material necessary to its erection. The plans and specifications shall be kept on file in the auditor’s office, and the plans, drawings, representations, bills of material, and specifications of work and estimates of cost, in detail and in the aggregate, shall be submitted to the commissioners, county auditor and county surveyor for approval, and if approved, a copy shall be deposited with the auditor for the inspection of all parties interested.
After all this is done, the auditor shall advertise for sealed proposals, etc., as directed in Section 798, Revised Statutes, and the only discretion the commissioners can exorcise is the making of a contract, without advertising, when the estimated cost of the bridge and the substructure does not exceed $1,000, and this discretion does not mean the omission of any of these preliminary acts or the utter disregard of the rights of the public.
The law never was intended to authorize bridge companies by their agents, to prepare plans and specifications, as we find in these instances, attach them to contracts prepared by themselves, and signed by commissioners, keeping the public and all parties that might be interested in furnishing material or labor, in perfect ignorance of their doings, until the whole matter is closed up.
Mr. Hunter tells us that, during the time he served as commissioner, not in a single instance have these requirements of the statute have been complied with in the letting of bridge contracts, and following an unbroken line of decisions by our higher courts, I find these requirements mandatory, and this attempt to expend more than $14,000 of the public money is without authority of law.
From what we learn' in this ease these three bridge companies have a monopoly of the bridge work in Ashland county, as we are told they have in other counties, and this in defiance of law with which they and the commissioners ought to be familiar. Contracts made by commissioners should appear on their journal, and be entered into where the law provides they shall transact public business, instead of elsewhere, and by signing contracts furnished, and filled up by the agent of the bridge companies. The auditor and the surveyor ought to know something *268 about these things, instead of being kept in the dark until the scheme of the bridge companies is accomplished.
The Supreme Court in a case somewhat similar to this said:
‘ ‘ The obvious policy of this law is to prevent the public treasury from being plundered by favoritism, ‘rings’ and frauds; and it ought not to be so construed as to defeat its purpose by a judicial repeal of its salutary provisions. The following sentence from a standard author on statutory construction covers the entire ground.
“Where the whole object of the Legislature would be defeated if the command to do the thing in a particular manner did not imply a prohibition to do it in any other manner, no doubt can be entertained that the command is imperative.”
While the commissioners can let a contract when the estimated cost of the bridge and the substructure does not exceed $1,000 the other requirements of the statute can not be omitted.
This estimated cost must be passed upon by the auditor and the surveyor in conjunction with the commissioners, before the commissioners can enter into any contract .whatsoever, and in no instance was there any estimated cost of the bridge and substructure or either.
Therefore these contracts are evidently designed to evade the necessity of advertising for bids. The “Saal bridge” contract let for $996 (superstructure only) excepts the lumber, which the commissioners must furnish. The “Ely bridge” contract excepts the lumber and backing, let for $995.
The “Niehol-Stentz” bridge contract excepts the abutments and piers, let for $993. “Substructures” comprehends everything pertaining to the foundations for bridges, and estimates thereof should be made as a part of the bridge. They can not be separated for the purpose of reducing the estimated cost of a bridge below $1,000.
Again, Section 800, Revised Statutes, provides that:
“No contract or contracts shall be made for any public building, bridge or bridge substructure, or for any addition to, change, improvement or repair of the same, or for the labor and materials herein provided for, at a price in excess of the estimates of this chapter required to be made.” This applies to all contracts.
*269 This entire business was transacted not only irregularly, but in utter disregard of every requirement of the statute. These contracts were entered into with these bridge companies, one at a time being dealt with, as though the commissioners were private individuals, and not the servants of the people and creatures of law.
Not until plans, specifications, etc., are prepared by the commissioners or by some competent architect or civil engineer for them, with an estimate of the cost in detail and in the aggregate of any particular bridge, all of which shall be approved by a majority of the commissioners with the county auditor and the county surveyor, and all these things on file in the auditor’s office, have agents of bridge companies, or others, any business to transact with the commissioners, much less any right to prepare their own plans and specifications, drive a bargain with the commissioners, procure their own signature to a contract, with their own plans and specifications attached, without any public light thrown upon it. Though the public may suffer inconvenience, which we regret, this unusual expenditure of the taxpayer’s money, more than $50,000, must be applied to the purposes for which it is levied in strict conformity to law and its requirements.
If this court could substitute the popular demand- for the expressed will of the law-making power of the state, we might permit some of these things to be done, but our obligation forbids.
We are construing these laws as they appear before us, and our construction will serve as a guide in the future and a precedent to be followed, unless a reviewing court should find we have erred.
That contracts may be let without publication is unquestioned, but before that is done the plans and specifications and estimates of cost of each one as J have outlined, must be approved in the manner provided, and all on file in the auditor’s office for public inspection.
While the commissioners “may” let contracts in this way, it does not mean that only one or two or three bridge companies shall know anything about it, but whoever will may have the privilege of saying what any particular job may be done for; *270 and in no case shall a job be let for more than the estimated cost, obtained in the way pointed out.
WilUam T. Devor, for plaintiff.
McCray & McCray, for defendant.
This proceeding has been wisely and properly instituted by the prosecuting attorney in the interests of the tax-payers of this county, and in discharge of a duty he owes the people he represents. Following the law closely in all matters pertaining to public outlays of money must be approved by every good citizen and this is the extent of his contention. That different modes have been adopted and followed heretofore by commissoners, affords no defense in this case, and those methods are now ended, if I am right in my view of the law and in my conclusions.
Contracts may be let without publication, if the necessary preliminary steps have been taken and plans and specifications, etc., approved as required, on file in the auditor’s office for the inspection of the public and all those who may desire to obtain such work or furnish material. There may be competition in this way as well as where notice for bids is given.
The amount of iron pipe for culverts in the entire county should be ascertained in the same manner as bridges, and the contracts let to the lowest bidder, whether publicly or privately. In disbursing this large sum of money competition should be allowed among all bridge companies within and without Ohio, and to all others interested, and good business methods would suggest the largest publicity, and thus avoid criticism and suspicion of favoritism and jobbery.
The tax-payers have an unqualified right to know how and where every dollar of this large amount goes, and the only way to assure this is to follow the requirements of the law, so specifically laid down in the statutes.
Finding for plaintiff, and defendants perpetually enjoined from completing any of the proposed contracts, and from proceeding to enter into contracts for bridges until all preliminary steps are taken, as outlined in the preceding opinion.